IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v.                                                         )<br>)<br>YOLDARI TEJEDA CORONADO,    )<br>)<br>Defendant                              ) | Criminal No. 25-MJ-3388-JDH |

MOTION IN SUPPORT OF DETENTION

The United States submits this motion in support of detention, in response to the Court's order dated February 9, 2026 (ECF 16).  For the reasons explained below, the transcripts attached to the defendant's motion are not materially different from the statements referenced in the affidavit submitted in support of a criminal complaint, and detention is necessary in this case.

Transcripts/Translations of Recordings

First, following receipt of the defendant's motion for release, law enforcement conferred with CD-1, who confirmed that a third individual was present on the November 12, 2026 call transcribed at Exhibit 2 to defendant's motion.  Upon re-reviewing the recording, CD-1 told law enforcement that the third party (who CD-1 does not know) made the statement "I'm bullshit cuz that's my money," and that the defendant made the statement "talk to that guy [Mexico]."  In the portion of the call referenced in Paragraph 49 of the complaint affidavit, the individuals on the call are speaking over each other, such that transcribers and translators listening to the call may have difficulty determining exactly who was speaking at a given point in the conversation. [1]

---

[1] The undersigned conferred with Carrie Lilley, the translator who prepared the transcripts for the defendant, in an effort to determine whether any corrections needed to be made by the government.  Ms. Lilley explained to the undersigned that the call participants were speaking over each other, that it was difficult to determine who was speaking, and that it would

Given CD-1's understanding of the context surrounding the situation, their familiarity with the defendant and his voice, and CD-1's role as a direct participant in the conversation at issue, their identification of statements attributable to the defendant are being credited by law enforcement. The attributions in Paragraph 49 are also consistent with the translation that was provided to the affiant in advance of drafting the complaint affidavit.[2]

Second, the transcripts that the defendant had prepared are not materially different from the statements referenced in the complaint affidavit.[3] The defendant claims that the transcripts reveal material differences because the complaint affidavit gives the impression that the defendant was demanding to be paid himself for the firearms. ECF 14 at 3. However, the complaint affidavit states that the firearms in question were brought to the pre-robbery meeting by the defendant's associates. *See* Aff. ¶ 38. Further, the complaint affidavit states that the defendant contacted CD-1 to demand payment for the firearms, that the defendant told CD-1 they were responsible for payment because they made the introduction to "Mexico," and that the defendant threatened that CD-1 would face harm if the payment was not made. *See* Aff. ¶¶ 38-49. This is consistent with the transcripts. *See, e.g.*, Ex. 1 at 9 ("who is the one that has to take the responsibility … they met the Mexicans through you."); *id.* at 11 ("Now I called you bro,

---

not be unreasonable for a different listener to reach a different conclusion regarding which individual is speaking in those particular instances.

[2] As set forth in the complaint affidavit, the affiant, who is not fluent in Spanish, relied on translations by other members of law enforcement, as well as information provided by CD-1. The November 12, 2025 recordings were reviewed and translated for the affiant by an HSI Task Force Officer who is fluent in both English and Spanish. *See* Aff. ¶¶ 8 n.3, 48.

[3] To the extent that some of the translations do not exactly match the translations as referenced in the complaint affidavit—for example, "I'm pissed" as opposed to "I'm bullshit"—those differences are not material, and the undersigned understands that such interpretative differences may result from differences in a translator's familiarity with dialect, slang, or the context of a conversation.

2

because I don't know what to do … I don't have the money to give it to the kid"); *id.* at 24 ("I'm going to give … [CD-1's] barber shop is that. These are kids that will come and tear the barber shop apart").

Whether or not the defendant would be keeping the money himself or passing it on to someone else is not material to the charge in the complaint. The statute governing extortionate collection does not require that the funds sought to be collected belong to the person making the demand. Instead, the statute punishes anyone who "knowingly *participates in any way*, or conspires to do so, in the use of any extortionate means to collect or attempt to collect *any* extension of credit." 18 U.S.C. § 894 (emphasis added). Regardless of whether the defendant would keep the money himself, the defendant was participating in making extortionate threats to CD-1 to demand payment for the firearms that his associates brought to the pre-robbery meeting.

Significantly, in the call transcribed at defense Exhibit 1, the defendant made multiple threatening statements, including:

- "I'm going to send him to your barber shop"
- "It's because of craziness that tragedy can be seen"
- "If it [the money] doesn't show up … you take the consequence"
- "What I'm going to give is: oh no, look it's CD-1 on Washington over there. [Their] barber shop is that. These are kids that will come and tear the barber shop apart"
- "you understand me, it's, it's going to be a problem after"

Additionally, there is no material difference in the complaint affidavit's references to the extension of credit. According to the transcript at Exhibit 2, CD-1 told the defendant that they would need "until Friday" to pay the debt. Thus, there are no differences between the transcripts and the affidavit with respect to any statements material to the crime charged.

3

Detention is Necessary to Ensure the Defendant's Appearance and Safety to the Community

The government moved for detention pursuant to 18 U.S.C. § 3142(f)(1)(A), because the case involves a crime of violence, and pursuant to 18 U.S.C. § 3142(f)(2)(A), alleging serious risk of flight. To determine whether detention is appropriate, the Court should consider the nature and circumstances of the offense charged, the weight of the evidence, the history and characteristics of the defendant, including whether at the time of the offense the defendant was on release pending trial, and the nature and seriousness of the danger to any person that would be posed by the defendant's release.

As outlined above, in the complaint affidavit, and in defense Exhibits 1 and 2, the defendant participated in the collection of an extension of credit by extortionate means. The defendant made multiple calls to CD-1 in which he explicitly conveyed threats to CD-1. Should the defendant be released, serious danger will be posed to CD-1.

Additionally, as set forth in the complaint affidavit, the defendant told the undercover ATF agents that he had previously participated in home invasions, and that he had a team that would dress up as police officers to effectuate such robberies. *See* ¶¶ 19-20. He explained how his team would tie people up, and said that they had firearms. *See id.*, ¶ 25. And, at the time of the instant offense, the defendant was, in fact, *on pretrial release* for charges including carrying a loaded firearm without a license. (West Roxbury District Court No. 2306CR00615). Further, law enforcement has learned that the defendant is involved in firearms trafficking. For example, during one of the calls between CD-1 and the defendant in the instant investigation, the defendant asked CD-1 if his associate had sent CD-1 photos of the firearms the defendant had for sale. *See* ROI attached as Exhibit 1. Finally, the defendant is known to have ties to the Trinitarios gang, a transnational criminal organization with thousands of members operating in

the United States, the Dominican Republic, and parts of South America and Europe, which routinely employs violence to assert control, expand influence, and intimidate rivals. When the defendant was arrested, law enforcement seized two phones from the defendant's person. The lock screen of one of the phones contained multiple symbols associated with the Trinitarios gang, pictured below:



The defendant proposes that he could be released to the home of the mother of his children, or his mother's home, and asserts that he would be willing to accept a curfew and electronic monitoring. However, electronic location monitoring is not sufficient to ensure the defendant's appearance or the safety of CD-1 or other members of the community. Location monitoring devices can be removed. And while law enforcement would be alerted to a removal, it is likely that the defendant could not be apprehended prior to fleeing or harming someone.

Conclusion

For the reasons set forth herein, the defendant should continue to be detained pending trial in this matter.

        Respectfully submitted,

        LEAH B. FOLEY
        United States Attorney

By: */s/ Lauren Maynard*
        Lauren Maynard
        Assistant U.S. Attorney

Date: February 11, 2026

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        */s/ Lauren Maynard*
        Lauren Maynard
        Assistant U.S. Attorney